United States Court of Appeals,

Fifth Circuit.

No. 94-10534

Summary Calendar.

In the Matter of SOUTHMARK CORPORATION, Debtor.

SOUTHMARK CORPORATION, Appellant,

v.

Joseph GROSZ, Appellee.

April 14, 1995.

Appeal from the United States District Court for the Northern District of Texas.

Before DUHÉ, WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Southmark Corporation ("Southmark"), a debtor in possession, appeals from a judgment dismissing its claim that a payment to Joseph Grosz, a former officer of one of Southmark's subsidiaries, was preferential and thus avoidable under 11 U.S.C. § 547. As we conclude that the bankruptcy court erred in determining that Grosz was not compensated with funds from Southmark's estate, we reverse the summary dismissal of Southmark's preference claim and remand for further proceedings consistent with this opinion.

I

FACTS AND PROCEEDINGS

Southmark, debtor in possession of a real estate and financial services company,[1] has literally hundreds of affiliated businesses

---

[1]As a debtor in possession in a Chapter 11 reorganization proceeding, Southmark has all the rights and powers of a trustee,

and subsidiaries, one of which is a wholly owned subsidiary named American Realty Advisors ("ARA"). In 1984, Grosz entered in an employment agreement with Southmark and Southmark Funding (later renamed ARA), to serve as the president and a director of ARA, and American Realty Trust, another of Southmark's wholly owned subsidiaries. In consideration of that service, Grosz was entitled to compensation in the form of, inter alia, loan procurement fees, bonuses, and profit sharing.

Sometime during the late 1980s, the relationship between Southmark and Grosz soured, and Southmark refused to pay Grosz portions of the accrued fees and bonuses to which he believed he was entitled. Southmark and Grosz decided to resolve the dispute out of court and entered in a settlement agreement.

Pursuant to that agreement, Southmark delivered Grosz a check totaling $289,258.96, $214,228 of which was for commissions and other compensation that he had previously earned.[2] Although the check named ARA as the remitter and the W-2 Form reporting Grosz' income to the IRS identified ARA as the payor, the check was actually drawn on an account owned by Southmark.

The somewhat confused circumstances surrounding the identity of the entity that paid Grosz were caused by the fact that Southmark uses a cash management system (the "CMS") to administer

---

which includes the right to avoid a payment under § 547. *See Georgia Pac. Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 966 n. 1 (5th Cir.1983).

[2]The remaining $75,030.96 was for future consulting services.

more efficiently and effectively its financial operations and assets. The CMS employs several different bank accounts to process all deposits, transfers, and payments of Southmark and of those affiliates and subsidiaries—such as ARA—that also use the CMS. Although each company's receipts and disbursements are commingled in the CMS for cash management purposes, they are segregated for record keeping purposes and can be readily identified. At the time Grosz was paid, ARA had a positive balance in the CMS.

Grosz' check was drawn on a general miscellaneous bank account, referred to as the "Payroll Account."[3] Like other accounts in the CMS, the Payroll Account is maintained in Southmark's name and is owned, operated, and controlled by Southmark. Southmark used funds from the account to pay for its own obligations in addition to those incurred by affiliates and subsidiaries participating in the CMS. There is no evidence of any agreement between ARA and Southmark restricting Southmark's access to or use of the funds in the Payroll Account. In fact, had Southmark desired, it could have totally depleted that account to pay its own creditors—or those of any affiliate or subsidiary—without regard to any other subsidiary's contribution to or balance remaining in the account.

In 1989, Southmark filed a voluntary petition for relief under

---

[3]The Payroll Account is funded periodically from a concentration bank account (the "Concentration Account"), which is maintained primarily to receive deposits from Southmark and its subsidiaries and affiliates. Those funds are then shifted as needed to other Southmark accounts. The Concentration Account is also in the name of, and operated without restriction by, Southmark.

3

Chapter 11 of the Bankruptcy Code.[4] Almost two years later, Southmark, as a debtor in possession, filed an adversary action in Bankruptcy Court in the Northern District of Texas in which it sought to recover, inter alia, the payment to Grosz, arguing that the transfer was a preferential payment and thus avoidable under § 547(b). Grosz filed a motion for summary judgment, arguing, among other things, that the funds with which he had been paid were not the property of Southmark's estate, so that the payment was not an avoidable preference. The bankruptcy court agreed and dismissed Southmark's preference claim (the "February Order"), then tried the remaining issues in the case, ultimately ruling in favor of Grosz on all counts.

Southmark appealed the February Order to the district court, which affirmed the bankruptcy court's summary judgment. In the instant appeal, Southmark urges only that the court erred in dismissing its claim that the $214,228 portion of the disbursement to Grosz was a preferential payment, and is thus avoidable under § 547(b).

II

ANALYSIS

A. STANDARD OF REVIEW

Both the bankruptcy court and the district court granted summary judgment for Grosz. "Summary judgment is appropriate if the moving party establishes that there is no genuine issue of

---

[4]Southmark originally filed its petition in the Northern District of Georgia, but the case was subsequently transferred to the bankruptcy court in the Northern District of Texas.

material fact and that it is entitled to a judgment as a matter of law."[5] "The courts' reasoning on issues of law must be appraised *de novo.*"[6]

B. PROPERTY OF THE DEBTOR'S ESTATE

Section 547(b) permits a debtor in possession to avoid transfers of its property if the transfer meets certain conditions established by statute.[7] A preliminary requisite, however, is that the transfer involve property of the debtor's estate. Even though Grosz was paid by check drawn on a bank account that is owned by Southmark, the bankruptcy court concluded that Grosz was entitled to summary judgment as there were no genuine issues of material fact presented, and that, as a matter of law, the payment was from ARA's estate, not the estate of Southmark. The district court agreed and affirmed the bankruptcy court, but for a different reason. The district court held that the funds in Southmark's Payroll Account in the CMS that were used to pay Grosz were held in a "quasi trust" for the benefit of ARA.[8] Even though we agree with

---

[5]*In re Jones,* 966 F.2d 169, 172 (5th Cir.1992) (citing FED.R.CIV.P. 56(c) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)); *see In re Baudoin,* 981 F.2d 736, 739 (5th Cir.1993).

[6]*In re Kolstad,* 928 F.2d 171, 173 (5th Cir.) (citing *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1307 (5th Cir.1985)), *cert. denied,* 502 U.S. 958, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991).

[7]*See* 11 U.S.C. § 547(b) (1988).

[8]Although the district court does not expressly use the phrase "constructive trust" in its judgment (that court referred only to a "quasi trust"), the record indicates that the court affirmed the bankruptcy court based on that theory. *See In re Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 597 (5th

5

both the bankruptcy and the district courts that the record presents no genuine issue of material fact regarding which estate, for the purposes of preference law, owned the funds that were paid to Grosz, we disagree with both courts' legal conclusions—drawn from the undisputed facts—that the funds were not part of Southmark's bankruptcy estate.

1. *ARA as the Remitter*

The bankruptcy court dismissed Southmark's preference claim against Grosz based primarily on the court's reasoning in a prior ruling, *Southmark Corporation v. Kranz,*[9] which involved Southmark and another of its subsidiaries, Southmark/Envicon. In *Kranz,* the bankruptcy court held that a payment to Kranz, a former officer of Southmark/Envicon, was not an avoidable transfer under § 547(b),

---

Cir.1991) ("A constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another.").

Moreover, the record does not support a conclusion that the funds were either held in an express or resulting trust or earmarked as ARA's for payment to Grosz. *See In re Oxford Management, Inc.,* 4 F.3d 1329, 1335 (5th Cir.1993) (concluding that no express trust can exist when recipient of funds can use them as its own and commingle them with its own monies); *Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1362 n. 12 (5th Cir.1986) (explaining that doctrine of "earmarking" cannot be invoked where debtor " "had absolute control over [the] funds [and claimant] had no legal right to force him to make an endorsement' " (quotation omitted)); *Harris v. Sentry Title Co.,* 715 F.2d 941, 946 (5th Cir.1983) (stating that resulting trust requires "evidence of a shared intent to establish a strict fiduciary relationship"), *modified on other grounds,* 727 F.2d 1368 (per curiam), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984).

[9]Ch. 11 Case No. 389-36324-SAF-11, Adv. No. 391-3400 (N.D.Tex. June 25, 1992).

even though that payment, like the one to Grosz here, was made from Southmark's Payroll Account.[10] The bankruptcy court took judicial notice of the fact that, in numerous other cases in which claims had been filed against Southmark's affiliates or subsidiaries, "Southmark had encouraged this court in thousands of objections to be very mindful of the separate legal entity [with which] people were dealing." The court then concluded that Southmark could not avoid the transfer, because Southmark/Envicon—not Southmark—was the corporate entity that actually paid Kranz, therefore the transfer was made with property belonging to Southmark/Envicon.

In the instant case, the court invoked *Kranz* and again held that the transfer did not involve property from Southmark's estate:

> The court has consistently in the Southmark case attempted to recognize appropriate boundaries of legal entities not imposing liability on a parent company if it's not there, but by the same token not permitting the parent company when it's appropriate to step into the shoes of the subsidiary and so forth. The result is there have been lots of claims against Southmark disallowed, but it also cuts in this case in favor of the defendant [Grosz].

The court continued,

> The fact that funds are transferred through a cash management system to get into a Southmark payroll account in San Jacinto does not create a genuine issue of material fact, [that] in this case this is an ARA, Inc. payment. It's an ARA check. W-2 Reports to the IRS it's an ARA payment. The ARA accounts are charged and credited. Southmark's providing a servicing function here only. The property interests are those of ARA.

The bankruptcy court's ruling dismissing Southmark's preference claim makes clear that the court was attempting, in an

---

[10]In that case, unlike this one, Southmark/Envicon had a negative balance in the CMS at the time that Southmark paid the subsidiary's former officer.

7

equitable fashion, to disentangle the various assets and liabilities of the Southmark family of companies.[11]  Although § 105(a) of the Bankruptcy Code ("Code") authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code, that provision does not, as we recently observed, empower bankruptcy courts to act as " "roving commission[s] to do equity.' "[12]  "Even the broad powers of the bankruptcy courts to fashion equitable remedies ... must be exercised only within the confines of the Bankruptcy Code."[13]  "The "statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law....' "[14]

---

[11]The bankruptcy court appears to have been persuaded by the evidence that ARA was the company identified as the payor on Grosz' check and on his W-2 Form, which suggests that the purpose of the transfer was to compensate Grosz for his service to ARA. But we have stated that, "[t]he purpose of the transfer is not dispositive of the question whether it qualifies as an avoidable preference under section 547(b) because "it is the *effect* of the transaction, rather than the debtor's or creditor's *intent,* that is controlling.' " *See In re T.B. Westex Foods, Inc.,* 950 F.2d 1187, 1195 (5th Cir.1992) (quoting 4 COLLIER ON BANKRUPTCY ¶ 547.01 (Lawrence P. King et al. eds., 15th ed. 1994) (emphasis in original)).  In this case, the effect was that the payment to Grosz depleted the amount of funds that otherwise could have been used to pay Southmark's creditors.

[12]*In re Haber Oil Co.,* 12 F.3d 426, 443 (5th Cir.1994) (quoting *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)); *accord In re Oxford Management, Inc.,* 4 F.3d at 1334.

[13]*In re Haber Oil Co.,* 12 F.3d at 442-43 (citing *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988)).

[14]*In re Oxford Management, Inc.,* 4 F.3d at 1334 (quoting *Sutton,* 786 F.2d at 1308).

In attempting to do equity here, the bankruptcy court exceeded the limits of its equitable powers under § 105(a) by creating substantive rights that otherwise would not have existed. The court ruled that ARA possessed a property interest in funds that, under the law governing avoidable preferences, indisputably belonged to Southmark's estate: The check paid to Grosz was drawn on Southmark's Payroll Account, a general bank account containing commingled funds,[15] to which Southmark held complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing,[16] including its *own* creditors.[17] The

---

[15]4 COLLIER ON BANKRUPTCY, *supra* note 11, ¶ 541.11, at 541-74 ("Deposits in a bank to the credit of a debtor become property of the estate under section 541(a)(1)."); *see In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1279 (8th Cir.1988) (same); *In re Bullion Reserve of N. Am.,* 836 F.2d 1214, 1217 (9th Cir.) (stating that money in commingled bank accounts under debtor's control "presumptively constitutes property of the debtor's estate"), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

[16]*See Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1358 (5th Cir.1986) (noting that "key" in determining if funds are part of debtor's estate is whether debtor "controls" the funds); *cf. In re Coutee,* 984 F.2d 138, 141 & n. 3 (5th Cir.1993) (per curiam) (stating that debtor is mere "conduit or agent" if party does not obtain "actual dominion or control over funds"); *see also In re Kemp Pac. Fisheries, Inc.,* 16 F.3d 313, 316-17 (9th Cir.1994) (per curiam) (holding transfer to be preferential where creditor "did not exercise the requisite control over the funds or place any limits whatsoever on the parties to whom debtor could present checks"); *In re Cybermech, Inc.,* 13 F.3d 818, 820-21 (4th Cir.1994) (holding transfer to be preferential where funds were commingled with other money, and debtor had "right to withdraw, transfer, or otherwise use the payment funds in any way it wanted"); *In re Chase & Sanborn Corp.,* 813 F.2d 1177, 1181 (11th Cir.1987) (noting that "any funds under the control of the debtor, regardless of their source, are properly deemed to be the debtor's property").

[17]In fact, one commentator has explained the proper resolution of a factual situation very similar to the one we

9

last point is particularly important, as the primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment.[18]

Conversely, if funds cannot be used to pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for preference purposes.[19] A common example is when

---

consider here:

> "If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate." In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law whether or not she actually owns it.

1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6-7, at 522 (1992) (quotation omitted). As in the hypothetical, it is undisputed that Southmark controlled the funds in the Payroll Account and that it could have paid them to anyone, including its own creditors. For the purposes of preference law, therefore, the money in Southmark's Payroll Account is treated as part of Southmark's estate, *whether or not Southmark actually owns it.*

[18]*Coral Petroleum, Inc.,* 797 F.2d at 1356 (citing with approval case explaining that key question in determining if transaction is preferential is whether transferred assets would otherwise have been available to pay claims of other creditors); *see* 4 COLLIER ON BANKRUPTCY, *supra* note 11, ¶ 547.03, at 547-22.2 ("The fundamental inquiry [in determining whether a transfer is preferential] is whether the transfer diminished or depleted the debtor's estate.")

[19]*See Coral Petroleum, Inc.,* 797 F.2d at 1359 (funds in debtor's account not part of debtor's estate where debtor never had control over funds); *see, e.g., Georgia Pac. Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 971-72 (5th Cir.1983) (funds received by debtor are part of estate, unless irrevocable agreement compels debtor to use money exclusively for creditor's benefit); *see also In re Auto-Train Corp.,* 810 F.2d 270, 274 (D.C.Cir.1987) (same).

a debtor holds funds in trust for another.[20]   Here, the district court invoked a trust theory—albeit constructive, not express—in affirming the bankruptcy court's judgment.   But, as explained immediately below, the summary judgment record cannot support that ruling.

2. *Constructive Trust*

The district court found that Southmark could not avoid the payment to Grosz because the funds that were used to pay him were not Southmark's.   Rather, said the court, the funds in question were held in "quasi" (or constructive) trust by Southmark for ARA.   Section "541(d) excludes property subject to a constructive trust from the bankruptcy estate."[21]

The district court relied on *Begier v. IRS*[22] in concluding that the payment to Grosz was not from Southmark's estate, because Southmark held only legal title to the money that was paid to Grosz, but not an equitable interest as well.   Although the district court properly invoked that aspect of *Begier* (*i.e.,* that

---

[20]*In re Bullion Reserve of N. Am.,* 836 F.2d 1214, 1217 n. 3 (9th Cir.) (explaining that presumption that funds in debtor's account belong to its estate is overcome by showing that funds were held in constructive trust for another), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988);   *see* 1 Epstein et al., *supra* note 17, § 6-7, at 522 ("[A] debtor's transfer of property held in trust by her is never a preference....") (citing § 541(b)(1)).

[21]*In re Haber Oil Co.,* 12 F.3d 426, 436 (5th Cir.1994);   *see In re Sakowitz, Inc.,* 949 F.2d 178, 181 (5th Cir.1991) ("[P]roperty held in trust for another is not property of the estate under 11 U.S.C. § 541 in the event of the trustee's bankruptcy."   (citing *Begier v. IRS,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)).

[22]496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

for property to be part of the debtor's estate the debtor must possess both legal title and equitable interest), the court did not first analyze whether ARA possessed an equitable property interest in the funds from Southmark's account that were used to pay Grosz. And, it is that issue that proves problematic in this case.

At the outset, it is important to distinguish generally between two types of "equitable interests." In a contractual (or debtor-creditor) relationship, the creditor may possess an "equitable claim" to property actually owned by the debtor, but there is no division of ownership or title in the property at issue; the debtor is entirely free to dispose of the property as he sees fit. In a trust relationship, by contrast, the law actually divides the bundle of rights in the property; the trustee holds legal title while the beneficiary possesses an equitable title or property interest.[23] Only in the latter instance—when legal title to the property is held by the bankrupt in trust for the benefit of another—is the property properly excluded from the bankrupt's estate under preference law.[24]

But when property that otherwise would be considered part of

---

[23]*See generally* GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 17, at 216–17 (2d rev. ed. 1984) (explaining distinction between the two "equitable interests").

[24]*See In re Monnig's Dep't Stores, Inc.,* 929 F.2d 197, 202 (5th Cir.1991) (holding that district court erred in imposing constructive trust where debtor-creditor relationship existed, not trust); *see also* BOGERT & BOGERT, *supra* note 23, § 17, at 216–17 ("If the trustee becomes insolvent, the beneficiary may take all identifiable trust property from the assets of the insolvent trustee.... The general creditor, on the other hand, having no property interest in the assets owned by his debtor, must accept merely a dividend." (footnotes omitted)).

a debtor's estate is alleged to be held in trust for another, "[t]he burden of establishing the existence of the constructive trust rests on the claimant."[25] "This burden is based in part upon the statutory intent reflected by the sweeping marshalling and avoidance powers accorded a trustee in order to secure all the debtor's property for an equal distribution according to the terms of the Code."[26] We are mindful, therefore, that the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; thus such a trust should not be imposed "cavalierly" in a bankruptcy proceeding.[27]

We look to state law to determine whether a party has adequately demonstrated that property is held in constructive trust for another.[28] As neither the bankruptcy nor the district court conducted the requisite analysis, neither court decided which state's laws should be applied in determining ARA's rights to funds deposited in Southmark's bank account. Based on the summary

---

[25]*In re Haber Oil Co.,* 12 F.3d at 436; *accord In re Oxford Management, Inc.,* 4 F.3d 1329, 1335 (5th Cir.1993).

[26]*Georgia Pac. Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 969 (5th Cir.1983).

[27]*In re Bailey Pontiac, Inc.,* 139 B.R. 629, 635 (N.D.Tex.1992); *see In re Haber Oil Co.,* 12 F.3d at 436 (noting that the imposition of a constructive trust can wreak havoc with the Code's priority system).

[28]*In re Haber Oil Co.,* 12 F.3d at 436; *In re Monnig's Dep't Stores, Inc.,* 929 F.2d at 201; *see, e.g., In re Oxford Management, Inc.,* 4 F.3d at 1336 (applying Louisiana law); *Georgia Pac. Corp.,* 712 F.2d at 969 (applying Arkansas and Mississippi law).

judgment record, however, Texas appears to have the "dominant contact" with the funds,[29] so we shall apply its laws.

"Under Texas law, a constructive trust is not actually a trust, but rather an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act."[30] We have explained that, "to justify imposing a constructive trust on property, fruad—either actual or constructive—must be present."[31] The record before us, however, is devoid of evidence of either.

This is no evidence of actual fraud in the record. Moreover, even assuming arguendo that Southmark, as ARA's parent company and the administrator of the CMS, owed a fiduciary-like duty to ARA, the record does not support a finding that Southmark breached that

---

[29]*In re Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 597 (5th Cir.1991).

[30]*In re Haber Oil Co.,* 12 F.3d at 436 (citations omitted); *see Southwest Livestock & Trucking Co. v. Dooley,* 884 S.W.2d 805, 810 (Tex.Civ.App.—San Antonio 1994, writ denied) (stating that a constructive trust is a broad and far reaching remedy).

[31]*In re Monnig's Dep't Stores, Inc.,* 929 F.2d at 201; *accord Exploration Co. v. Vega Oil & Gas Co.,* 843 S.W.2d 123, 127 (Tex.Civ.App.—Houston 1992, writ denied); *see In re Haber Oil Co.,* 12 F.3d at 437 (noting that the imposition of a constructive trust is justified in generally two circumstances: actual fraud, or breach of a confidential or fiduciary relationship); *In re Carolin Paxson Advertising, Inc.,* 938 F.2d at 597 ("Texas law imposes such a trust when one obtains property by fraudulent means, when an absolute conveyance of property was performed but not intended, or when a party breaches a fiduciary-like relationship.").

"We have summarized the elements of a constructive trust under Texas law as (1) breach of a fiduciary relationship or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res." *In re Haber Oil Co.,* 12 F.3d at 437.

duty.  As a parent company, Southmark was responsible for producing the maximum results from its investments in its subsidiaries, including ARA.  To help accomplish that goal, Southmark created the CMS, which consisted of, inter alia, the Payroll Account from which Grosz' check was drawn.  But there is no evidence—and Grosz does not claim—that Southmark violated any duty by establishing the CMS.  Neither is there evidence that Southmark misappropriated any of ARA's deposits, used ARA's deposits in an unreasonable manner, or abused its position with ARA by filing for bankruptcy.  In short, there is nothing in the record to indicate that Southmark violated any duty that it may have owed to ARA.[32]  And, absent some proof of that type, there is no justification for imposing a constructive trust in this bankruptcy proceeding.

As we have recently written,

> [t]he remedy of a constructive trust is ... a potent one in bankruptcy because it gives the successful claimant "priority over the defendant's unsecured creditors" to the extent of the property subject to the trust.  As a result, creditors of the bankrupt debtor have every incentive to argue that their unsecured claims are eligible under state law for the remedy of a constructive trust.  Because the constructive trust

---

[32]In that regard, the facts of this case mirror those recently considered by a Colorado district court in *In re Amdura Corp.,* 167 B.R. 640 (D.Colo.1994).  In that case too, a debtor's subsidiary argued that the court should impose a constructive trust on certain funds that the subsidiary apparently had deposited in a "concentration account," the legal title to which was owned by the subsidiary's parent company.  Applying Colorado state law, which is quite similar to the Texas law applied here, the district court ruled that the imposition of a constructive trust was not warranted, as the subsidiary failed to establish that the parent company abused any confidential relationship that it might have had with its subsidiary.  Important to that judgment was the fact that the subsidiary's parent, like Southmark here, had absolute discretion to spend funds in the concentration account.

15

doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so.[33]

Although the district court likely believed that substantial justification for imposing a constructive trust existed here, the court was still required to apply state law to ascertain whether (1) ARA was entitled to the benefit of that equitable remedy, and (2) the remedy could be properly fashioned from the facts and within the confines of the Bankruptcy Code. The court failed to do either. Furthermore, as Grosz has not demonstrated that the money that he received from Southmark's Payroll Account was held—or should be deemed to have been held—in trust for ARA by Southmark, we conclude, as a matter of law, that based on the undisputed facts, those funds are the property of Southmark's estate for the purposes of § 547(b).[34]

III

CONCLUSION

The bankruptcy court erred in summarily dismissing Southmark's claim that Grosz received a preferential transfer based on the court's conclusion that funds paid to Grosz from the Payroll Account were not part of Southmark's estate. Likewise, the district court erred in affirming the bankruptcy court on a

---

[33]*In re Haber Oil Co.,* 12 F.3d at 436 (citations omitted).

[34]We decline Grosz' invitation to affirm the bankruptcy court's judgment on the alternative theories proffered by Grosz, but not ruled on by either court. To do so would require that we make original findings of material facts, a task more appropriately left to a trial court.

16

constructive trust theory.  Accordingly, the bankruptcy court's order dismissing Southmark's preference claim against Grosz, as affirmed by the district court, is reversed, and this matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.

REVERSED and REMANDED.