# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 27, 2012

No. 10–20670

Lyle W. Cayce
Clerk

In the Matter of: IFS FINANCIAL CORPORATION,

Debtor

------------------------------------

GUILLERMO DE LA PENA STETTNER; MARIO VALVERDE GARCES; LUIS DE LA PENA; MARGARITA ISABEL DE LA PENA STETTNER; MARIA CRISTINA DE LA PENA; MARIA PAZ DE LA PENA,

Appellants

v.

W. STEVE SMITH, TRUSTEE,

Appellee

----------------------------------------------------------------------------------------------------------------

In the Matter of:  IFS FINANCIAL CORPORATION,

Debtor

------------------------------------

W. STEVE SMITH,

Appellee

v.

GUILLERMO DE LA PENA STETTNER

Appellant

----------------------------------------------------------------------------------------------------------------

No. 10–20670

In the Matter of:  IFS FINANCIAL CORPORATION,

Debtor

------------------------------------
W. STEVE SMITH,

Appellee

v.

MARIO VALVERDE GARCES

Appellant
--------------------------------------------------------------------------------------------------------------

In the Matter of:  IFS FINANCIAL CORPORATION,

Debtor

------------------------------------
W. STEVE SMITH, TRUSTEE,

Appellee

v.

LUIS DE LA PENA; MARGARITA ISABEL DE LA PENA STETTNER; MARIA CRISTINA DE LA PENA; MARIA PAZ DE LA PENA

Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before GARZA, CLEMENT, and SOUTHWICK, Circuit Judges.

No. 10–20670

EMILIO M. GARZA, Circuit Judge:

In this bankruptcy appeal, Guillermo de la Pena Stettner, Mario Valverde Garces, Luis de la Pena, Margarita Isabel de la Pena Stettner, Maria Cristina de la Pena, and Maria Paz de la Pena (together, "Appellants") appeal the district court's affirmance of the bankruptcy court judgment of over $3 million in favor of Appellee W. Steve Smith ("Smith"), trustee of IFS Financial Corporation's ("IFS") estate. Their appeal centers on the district court's finding that IFS fraudulently transferred funds to the Appellants. We AFFIRM.

## I

IFS and seventeen affiliated organizations (together with IFS, "Interamericas") were debtors in a series of Chapter 7 cases. This appeal arises from eight collective adversary proceedings, which Smith as trustee brought against the Appellants for avoidance of fraudulent transfers under Chapter 5 of the Bankruptcy Code and Chapter 24 of the Texas Business and Commerce Code.

Interamericas, based in The Woodlands, Texas, extended its operations internationally in the insurance, mortgage, and banking services industries. Many Interamericas entities did no more than temporarily stow stock in other Interamericas companies, among which were offshore shell companies created solely to channel money between investors and actively operating Interamericas organizations. Interamericas' activities centered on IFS. At Interamericas' helm was the Pimienta family.

Hugo Pimienta led Interamericas and acted as the primary decision maker for many Interamericas entities in the United States. Along with his father, he exercised power of attorney over several Interamericas entities abroad. Even though the different Interamericas companies had separate corporate structures,

3

No. 10–20670

a single advisory board based in The Woodlands—also dominated by the Pimienta family—oversaw all Interamericas operations and gave orders to Interamericas officers and managers. The advisory board set interest rates, managed investments, transferred money between Interamericas enterprises, and personally handled the sale of assets. No company in Interamericas' network operated independently of this board. When the board was not meeting, it entrusted its full authority to Hugo Pimienta.

Interamericas' investors were predominantly Mexican citizens. They reportedly deposited their contributions into one of three bank accounts in Texas: (1) account no. 137456 in the name of "Integra Bank" at Southwest Bank of Texas; (2) account no. 325716 in the name of "INV Capital" at Southwest Bank of Texas; and (3) account no. 91538 also in the name of "INV Capital" at Woodforest National Bank. The Integra and INV accounts served as the primary stream of funds into Interamericas; these accounts received over $270 million in funds from investors between December 1999 and October 2001. Other Interamericas entities also deposited over $163 million in funds in the same accounts during that period. Although investors were told that their deposits took some distinct, individualized form—such as a certificate of deposit, money market account, or bearer note—in reality, the Integra and INV accounts pooled all investor funds.

To track investments in the different Interamericas companies placed in these accounts, Interamericas used a software program known as the Portia system. The system generated statements for investors that listed supposed investment activity, interest rates, maturity dates, and deposits and withdrawals. Interamericas Business Services, another Interamericas company, provided administrative services for the system's users. Investors apparently

believed that their funds were held in a bank by the name of Integra, rather than in an account under the name "Integra Bank" located in Texas.

The organization named Integra Bank did in fact exist. Although operating out of a physical structure in Curaçao, where it was incorporated, Integra Bank lacked tellers and had little interaction with depositors. Integra Bank was independent from Interamericas only on paper. It is unclear what actual function Integra Bank provided. IFS promoters[1] forwarded checks from investors to IFS offices in The Woodlands, Texas, rather than to Integra Bank, for deposit into one of Interamericas' three accounts. When investors wanted to remove funds, they contacted IFS—not Integra Bank. Hugo Pimienta or other advisory board members approved all withdrawals. No one at Integra Bank had the independent authority to withdraw funds from the account held in its name.

A series of events from 1997 to 2002 led to Interamericas' downfall, leaving IFS its only functional entity. First, in late 1997, a failed merger led to philosophical differences between Hugo Pimienta and a group of investors from a non-Interamericas company, GCM Corporation Limited ("GCM"). GCM withdrew from its relationship with Interamericas and agreed to accept a $50 million note from another Interamericas company, Interamericas Financial Holdings Corporation ("IFH"). IFH soon defaulted on this note, however, and GCM sued to enforce their agreement. IFS, IFH, and GCM reached a compromise in May 2000: IFS replaced IFH as the note's obligor, and Blitz Holdings Corporation, another non-Interamericas company, replaced GCM as the note's payee. IFS restructured its debt, and GCM's note increased to $70

---

[1] The bankruptcy court explained, "Interamericas Companies paid 'promoters' to solicit investors and encourage investors to keep their assets with the enterprise. Promoters were paid 0.10-1.00% per month of total investments retained by Interamericas Companies. . . . The promoter commission and interest rates were to be paid from the operation of Interamericas Companies' businesses." *In re IFS Fin. Corp.*, 417 B.R. 419, 429 (Bankr. S.D. Tex. 2009).

million in value. Over the next year, IFS paid Blitz $30 to $40 million out of the Integra account before ultimately defaulting. Blitz brought a series of lawsuits against IFS to recover the note's balance.

Over the course of Blitz's litigation, all evidence suggests that the Interamericas companies were not operating as a financially stable or ethically sound enterprise. During that time, the advisory board removed funds belonging to IFS and Interamericas subsidiaries from the Integra account and began loaning millions to IFS shareholders and insiders, including the Appellants. As IFS defaulted on obligations to GCM and Blitz, American Founders Life Insurance Company ("AFL"), an alleged fully-owned subsidiary of IFS, funneled approximately $40 million to IFS investors in the form of "Select Asset Loans," which were loans in name only; the money actually went to IFS. These loans served the purpose of streaming cash out of AFL and into IFS while buoying AFL's balance sheet with the appearance of obligations from creditworthy investments. In late 1999, IFS sold AFL in exchange for $49.5 million and 50,000 shares of stock in another Interamericas entity. In November 1999, IFS also negotiated the sale of Accubanc Mortgage, another allegedly fully-owned subsidiary of IFS, for $30 to $40 million. Most proceeds from the sales of AFL and Accubanc went through holding companies into the Integra account in Texas. By 2002, the advisory board had sold off most of Interamericas. Only IFS remained afloat.

IFS filed for bankruptcy in 2002. The bankruptcy court appointed Smith to represent the IFS estate as its trustee. Smith filed over a hundred separate adversary proceedings, including eight adversary proceedings against the Appellants, which the bankruptcy court consolidated. In the consolidated proceedings against Appellants, Smith sought to avoid $3 million in transfers

No. 10–20670

IFS made to the Appellants in Interamericas' final years.  Invoking Texas law through the federal bankruptcy code, *see* 11 U.S.C. § 544; TEX. BUS. & COM. CODE ANN. § 24.005, Smith claimed fraud, aiding and abetting fraudulent transfers, and conspiracy.  The bankruptcy court disallowed any claims based on veil-piercing or earmarking theories.

After a series of overlapping trials and summary judgment motions, the bankruptcy court issued a final opinion in September 2009.  That court found that the evidence supported trustee's claims of fraudulent transfer against the Appellants and summarized its principal findings:

- The funds were paid out of an account legally titled in the name "Integra Bank," but actually owned and controlled by the Interamericas Companies.
- IFS, acting through its officers and agents, exercised exclusive control over the account.
- The funds were paid on account of antecedent debt but in furtherance of a fraudulent scheme.
- The [Appellants] knew or should have known of the fraudulent scheme.

*In re IFS Fin. Corp.*, 417 B.R. at 427.

Specifically, the bankruptcy court found that transfers to the Appellants were fraudulent and awarded judgments totaling $3,131,315.20 against the Appellants.  The Appellants appealed the bankruptcy court's judgment to the district court.  The district court affirmed.  The Appellants now seek our review of the district court's judgment.

Appellants raise two issues for our review:  (1) whether the district court erred in determining that IFS was the de facto owner of three bank accounts through which its allegedly fraudulent transfers passed; and (2) irrespective of

No. 10–20670

ownership, whether the district court erred in finding that Smith met his burden to establish fraudulent transfers.[2]

## II

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied." *Barner v. Saxon Mortg. Servs., Inc. (In re Barner)*, 597 F.3d 651, 653 (5th Cir. 2010) (citation and internal quotation marks omitted). Like the district court, we review factual findings for clear error and legal conclusions de novo. *In re Amco Ins.*, 444 F.3d 690, 694 (5th Cir. 2006). "When the district court has affirmed the bankruptcy court's findings, [the clear error] standard is strictly applied, and reversal is appropriate only when there is a firm conviction that error has been committed." *Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 475 (5th Cir. 1994).

---

[2] Appellants request our consideration of a third issue: whether the district court erred in determining that the Appellants were proper relief parties or were IFS insiders. We do not reach the merits of either issue, however. Our review shows that Appellants did not raise the question of whether they were relief defendants before the bankruptcy court. We therefore do not address it now. *See In re Martin*, 222 F. App'x 360, 362 (5th Cir. 2007) (citing *In re Ginther Trusts*, 238 F.3d 686, 689 & n. 3 (5th Cir.2001) (holding that we will not consider any issues on appeal that were not raised before the bankruptcy court). And the question of whether Luis de la Pena was an insider affects only the analysis of whether IFS had actual intent to "hinder, delay, or defraud" under § 24.005 of the Texas Business and Commerce Code. *See* TEX. BUS & COM. CODE ANN. § 24.005(a)(1), (b)(1). Because we separately conclude in Part V, *infra*, that IFS had the requisite intent based on IFS's transfers to the Appellants at the same time it was facing litigation, substantial debt, and attempts to liquidate a large portion of its assets before filing for bankruptcy, as well as evidence of its overall fraudulent structure, and because the resolution of the question of whether Luis de la Pena is an insider would not displace this analysis, we decline to reach this question on appeal. To the extent the Appellants dispute Luis de la Pena's insider status for other reasons, they have waived those argument by failing to brief them. *See* FED. R. APP. P. 28(a)(9)(A); *Alameda Films SA de CV v. Authors Rights Restoration Corp., Inc.*, 331 F.3d 472, 483 n.34 (5th Cir. 2003).

No. 10–20670

## III

Section 544(b)(1) allows Smith as trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim."[3]  *See* 11 U.S.C. § 544(b)(1). Section 550 outlines the remedy available to Smith if successful on his § 544 claim:  he may recover, for the benefit of the estate, property transferred fraudulently or, alternatively, the value of the property.  *Id.* § 550.  "Property of the debtor" under § 550 is "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."  *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990).

"The trustee's successor rights arise under federal law, but the extent of those rights depends entirely on applicable state law."  *In re Moore*, 608 F.3d at 260; *see ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 156 (S.D. Tex. 2009) ("Trustees . . . use § 544(b) as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy.").  The bankruptcy court, district court, and parties all applied Texas law to Smith's claim.  We agree that application of Texas law is appropriate in light of Texas's dominant contacts with the disputed funds.  *See Southmark v. Grosz (In re Southmark)*, 49 F.3d 1111, 1118 (5th Cir. 1995) (explaining that we apply the law of the state with the dominant contact with the funds).

---

[3]  This court recently clarified the purpose of a § 544(b) claim in *In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010):  "If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer.  Although the cause of action belonged to one creditor, any property the trustee recovers becomes estate property and is divided pro rata among all general creditors."

No. 10–20670

Chapter 24 of the Texas Business and Commerce Code allows creditors to avoid fraudulent transfers by debtors. Section 24.005(a) of the Code relevantly provides:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.

So while Texas law standing alone does not permit Smith as IFS's trustee to bring a fraudulent-transfer claim, § 554(b) allows Smith to avoid transfers on behalf of IFS's bankruptcy estate if he shows that they are fraudulent under § 24.005. *See In re Moore*, 608 F.3d at 261 ("[S]uch claims become estate property once bankruptcy is under way by virtue of the trustee's successor rights under § 544(b)." (internal citations and quotation marks omitted)). Smith as trustee bears the burden of establishing alleged fraudulent transfers by a preponderance of the evidence. *Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg., Inc.)*, 81 F.3d 592, 596 (5th Cir. 1996).

## IV

Appellants' first claim on appeal turns on whether IFS "owned" the Integra and INV bank accounts, such that these accounts are an "interest of the debtor in property . . . that is voidable under [Texas] law by a creditor holding an [allowable] unsecured claim." *See* 11 U.S.C. § 544 (b)(1). Applying Texas law, both the bankruptcy and district courts held that these accounts were such interests based on what they termed IFS's "de facto" ownership. We agree.

Texas law broadly defines the property of a debtor to be "anything that may be subject to [the debtor's] ownership." TEX. BUS. & COM. CODE ANN. §

24.002(2),(10). Appellants dispute the inclusion of the Integra and INV accounts in IFS's estate as property subject to IFS's ownership and specifically contest the district court's finding of IFS's de facto, as opposed to legal, ownership on the basis of IFS's control over the accounts. Appellants claim that the case law does not support the concept of control over bank accounts held in the name of another entity, particularly here, where IFS lacked signature authority over the accounts, and neither IFS nor Hugo Pimienta owned any interest or exercised any authority over Integra.

Smith does not dispute that IFS did not legally own the Integra or INV accounts; nor does he contest IFS's lack of signatory authority over those accounts. He does not contend that IFS owned or held shares in Integra or INV, or that IFS or anyone at IFS was an Integra officer, director, or employee. He agrees, moreover, that no formal document shows IFS's authority over Integra or its accounts. But Smith asserts that these lack of formalities merely evince IFS's intent to defraud by intentionally avoiding a paper trial which would allow creditors to easily identify its assets. Smith directs our focus to the fact that IFS was Interamericas' only operating company in its final years and, moreover, its only shareholder with any value. Based on this fact, Smith stresses that any money in the Integra and INV accounts was effectively IFS's; IFS should not be able to evade full discharge of debts in this bankruptcy through an intentionally obscure organizational structure.

The question Appellants ask us to resolve—whether legal ownership is required to show that IFS owned the Integra and INV bank accounts, such that they form part of IFS's bankruptcy estate—is a question of first impression. The scant case law within our grasp shows that in answering this question on appeal, control is more decisive than ownership. Guided by these principles, we hold

that control may be sufficient to show ownership in what is ultimately a fact-based inquiry that will vary according to the peculiar circumstances of each case.

Texas law counsels that the legal titleholder to a bank account is not always the owner of its contents. *Silsbee State Bank v. French Mkt. Grocery Co.*, 132 S.W. 465, 466 (Tex. 1910). To ascertain ownership, Texas law directs courts to look not to the legal relationship between parties; rather, courts are to examine the individual facts of each case. *Id.* Reflecting this understanding, the Texas Supreme Court held that a depositor of funds to an account in his name was not the owner of the funds where he deposited the funds as "agent" and an unknown third party withdrew the funds that same day. *Id.* "[T]he probative force of the facts" showed that the account's owner was not the one "found in the full possession and control of the money deposited." *Id.* An unseen hand exercised actual control over the account. *See id.*

Further, in the context of voiding preferential transfers under § 547 of the Bankruptcy Code, this court opined in *Southmark v. Grosz (In re Southmark)*, 49 F.3d 1111, 1116–17 (5th Cir. 1995) that control over funds in an account is the predominant factor in determining an account's ownership. Central to the dispute in *Southmark* was a payroll check drawn from an account in the debtor's name. *Id.* at 1113–14. The debtor legally owned the account, but the debtor and its parent and affiliate companies all commingled their funds in it. *Id.* Rather than focus on the debtor's legal title to the account, this court emphasized the debtor's control over an account, explaining that "the primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *Id.* at 1117. Ultimately, the "unfettered discretion to

No. 10–20670

pay creditors of its own choosing" supported the control requisite to *Southmark*'s finding of ownership.[4]  *Id.* at 1116.

Although until now, the case law, emphasizing control over legal title, has left unanswered the question of whether legal title, even though secondary to control, is a threshold requirement for ownership, the facts of this case illustrate

---

[4] Although we acknowledge that the bankruptcy court did not allow Smith to proceed under earmarking or veil-piercing theories, the law undergirding these theories is nevertheless instructive and lends broader support to our holding.  The earmarking doctrine also emphasizes control, and echoes the Texas Supreme Court's early view of control (or lack of control) of an account's title owner seen in *Silsbee*.  The doctrine acknowledges that funds may be in a debtor's account yet outside of its control—and therefore outside the reach of the bankruptcy estate.  *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986) (Where "'a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets.'" (quoting 4 COLLIER ON BANKRUPTCY ¶ 547.25 at 547 (101–102) (15th ed. 1986))).  Bankruptcy courts widely accept the earmarking doctrine "as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate."  *Id.*

But this doctrine applies narrowly.  *See id.*  The Fifth Circuit rejected application of this doctrine where a debtor had dispositive control over loan proceeds deposited into its account.  *See Caillouet v. First Bank & Trust (In re Etringer Bakeries, Inc.)*, 548 F.3d 344 (5th Cir. 2008).  Although the debtor claimed he had received the loan to pay a specific creditor, there was no stipulation that the debtor would pay the creditor using the funds and, further, the debtor was free to maintain the funds until he intentionally acted to release them to the creditor by writing a check.  *Id.* at 350.

And the general principle that a parent company's ownership of a subsidiary does not equate to absolute control over that subsidiary—thus, precluding the mechanical conclusion that assets belonging to the subsidiary may satisfy the debts and liabilities of the parent— is not absolute.  *See In re Sims*, 994 F.2d 210, 218 (5th Cir. 1993).  Where a parent company dominates its subsidiary to such an extent that the subsidiary is little more than the parent's ambling marionette, and the "directors and stockholders utilize[] the corporate entity as a sham to perpetuate a fraud," we may find control sufficient to rub out the artificial boundaries between parent and subsidiary.  *Id.; see Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 n.33 (5th Cir. 2011) ("When examining claims of fraud, courts can ignore technicalities such as multiple layers of business entities and look directly to the true parties in interest and control.").  In assessing whether the boundary between parent and subsidiary is sufficiently insubstantial, we often consider whether (1) the subsidiary operates with grossly inadequate capital; (2) management keeps daily operations of the two corporations separate; (3) the subsidiary observes the basic corporate formalities; and (4) the management of the subsidiary acts in the company's best interest or takes orders from the parent.  *Id.*

No. 10–20670

why it should not be: regardless of its legal title, IFS had the ultimate power to transfer funds to others, who included the Appellants. That it obscured its power to transfer in an intentionally complicated corporate structure suggests that control is decisive, and that legal title is irrelevant where, as here, a debtor organization has taken care to mask its activities through fictional divisions. Both the bankruptcy and district courts' conclusions of de facto ownership find support in the law and the evidence.

Texas law and our Bankruptcy Code precedent navigate us toward the conclusion that control is the primary determinant of ownership of bank accounts such as those central to this appeal. Control over an account, and its contents, is central to assessing whether they are to form part of a bankruptcy estate. But in this necessarily fact-based inquiry, *see Silsbee*, 132 S.W. at 466, control, while primary, may not always be decisive, and legal ownership is not irrelevant. *See In re Southmark*, 49 F.3d at 1116–17. Where, as here, evidence of fraud and the debtor's strict control are both strong, disputed legal ownership is less compelling. On the other hand, where evidence of fraud is weak, legal ownership might weigh heavier in our calculus.

Although the Interamericas entities were separate and distinct, the facts support the district court's and bankruptcy court's findings that IFS dominated these subsidiaries to such an extent that the subsidiaries acted at IFS's direction and that the directors and stockholders utilized the corporate entity as a sham to perpetuate a fraud. A single advisory board controlled all the Interamericas corporations. A single advisory board set interest rates on the investments on the three accounts, controlled how to invest the money, decided the selling price and date of sale of Interamericas entities, and decided when to transfer monies from Interamericas entities. The district court's finding that IFS used the accounts as its general operating fund also finds support in the record. Thus,

14

No. 10–20670

this record reflects that IFS exercised such control over these accounts that it had de facto ownership over these accounts, as well as the funds they contained. The lower courts' findings of ownership are not clearly erroneous and, moreover, comport with precedent and our holding today.

## V

Appellants' second claim on appeal turns on whether Smith established a fraudulent transfer to the Appellants—specifically, whether Smith properly established a claim under 11 U.S.C. § 544. The bankruptcy and district courts held that Smith did. We agree.

In affirming the bankruptcy court's finding that the transfers to Appellants could be avoided as fraudulent under Texas law, the district court stressed that IFS made transfers to the Appellants just as it was facing litigation, was burdened with substantial debt, and sought to liquidate a large portion of its assets before filing for bankruptcy. The bankruptcy court's decision rests on nearly identical findings.

Section 24.005(a)(1) of the Texas Business and Commerce Code defines a fraudulent transfer to include a transfer made with actual intent to hinder, delay, or defraud a creditor:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.

The statute focuses on the transferor's intent, rather than the transferee's. *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("'[T]he transferees' knowing participation is irrelevant under the statute' for purposes

No. 10–20670

of establishing the premise (as opposed to liability for) a fraudulent transfer.")
(quoting *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).

To determine whether a transfer is made with the requisite intent, we may
examine a number of factors, including whether (1) before the transfer was
made, the debtor had been sued or threatened with suit; (2) the debtor removed
or concealed assets; and (3) the transfer occurred shortly before or shortly after
a substantial debt was incurred. TEX. BUS & COM. CODE ANN. § 24.005(b).
Evidence that a company operated as a fraudulent enterprise at the time of the
transfer, moreover, may be sufficient to establish actual intent. *See SEC*, 487
F.3d at 301 (finding that evidence that the company operated as ponzi scheme
sufficient to establish actual intent); *see also Dean v. Davis*, 242 U.S. 438,
444–45 (1917) (noting that knowingly making a transfer that constitutes a
fraudulent act is sufficient to find actual intent to defraud creditors).

Appellants fail to raise any arguments that would merit reversal. Smith
more properly directs our attention to evidence suggesting that IFS had the
actual intent to hinder, delay or defraud its creditors: (1) transfers to the
Appellants were transfers to insiders; (2) IFS concealed its transfers through
the use of Portia numbers in the place of investor names and the nature of the
transfers; (3) IFS made the transfers during its dispute and litigation with Blitz
and other pending litigation; (4) IFS transferred substantially all assets; (5) IFS
concealed assets from Blitz and other creditors through its fraudulent scheme;
(6) IFS did not receive reasonably equivalent value for the transfers to the
Appellants; and (7) the transfers occurred shortly before or shortly after IFS
incurred its direct obligation to Blitz.

For the reasons Smith raises, we find that this record supports the
bankruptcy and district courts' findings of fraudulent transfer. Specifically, IFS
faced pending lawsuits and mounting debts just as it liquidated nearly all

No. 10–20670

Interamericas' assets. TEX. BUS & COM. CODE ANN. § 24.005(b)(4),(9),(10). Further, evidence that IFS operated as a fraudulent enterprise at the time of the transfers supports this finding of fraudulent intent. *See SEC*, 487 F.3d at 301.

**VI**

In sum, neither the bankruptcy court nor district court erred. We AFFIRM the district court's affirmance of the bankruptcy court's judgment in full.