# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10563

United States Court of Appeals
Fifth Circuit

**FILED**

April 28, 2015

Lyle W. Cayce
Clerk

In the Matter of:  AMERICAN HOUSING FOUNDATION,

Debtor

------------------------------

ROBERT L. TEMPLETON,

Appellant Cross-Appellee

v.

WALTER O'CHESKEY,  Trustee

Appellee Cross-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before KING, DAVIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

Appellant Robert Templeton invested in certain limited partnerships formed under the auspices of American Housing Foundation, the debtor, which was in the business of developing low-income housing projects. American Housing Foundation, which issued guaranties of Templeton's investments, ultimately filed for Chapter 11 bankruptcy. Templeton asserted claims against American Housing Foundation in bankruptcy based on the guaranties and

No. 14-10563

based on various state law causes of action related to his investments. The bankruptcy court issued a judgment subordinating those claims "pursuant to the provisions of 11 U.S.C. § 510(b)." The court also voided, as preferential, transfers made to Templeton within 90 days of the bankruptcy filing. However, the bankruptcy court refused to void allegedly fraudulent transfers.

The parties cross-appealed to the district court, which affirmed the bankruptcy court's judgment in its entirety. The parties now cross-appeal to this court. For the following reasons, we AFFIRM in part and REVERSE in part the judgment below.

## I.     Factual and Procedural Background

### A. Factual Background

Steve W. Sterquell, a certified public accountant, was the president and executive director of debtor American Housing Foundation ("AHF"). Founded by Sterquell in 1989, AHF is a 501(c)(3) non-profit, tax-exempt entity which develops low-income housing projects. By 2009, AHF owned or managed approximately 14,000 housing units across nine states. Many of these properties were eligible for Low Income Housing Tax Credits (LIHTC) and other tax exemptions and financial aid.

AHF used these tax advantages in the financing of its developments. Among other arrangements, AHF created various single-purpose limited partnerships ("LPs") to fund these projects.[1] Either AHF or one of its wholly-owned subsidiaries served as the general partner for these LPs. Private investors would buy into the LPs and serve as limited partners; AHF guaranteed repayment of those investments, often unconditionally, and sometimes with interest. AHF purportedly sought investments in these LPs

---

[1] AHF also used, for example, tax-exempt bonds to finance acquisitions.

2

to cover certain "soft" costs for its projects—e.g., attorney's fees, architect's fees, surveying fees, paint, as well as expenses related to the LIHTC application process.[2]  AHF represented that through the LIHTC program, investors could "make an equity contribution to the development of rental units for low-income households" and receive "a dollar-for-dollar reduction of their tax liability."[3]  This general arrangement is not an uncommon method of funding low-income housing developments.  *See* Eric Mittereder, *Pushing the Limits: Nonprofit Guarantees in LIHTC Joint Ventures*, 22 J. Affordable Hous. & Cmty. Dev. L. 79, 82–84 (2013); Roberta L. Rubin & Jonathan Klein, *Nonprofit Guaranties in Tax Credit Transactions: A New Era?*, 15 J. Affordable Hous. & Cmty. Dev. L. 314, 315–16 (2006); Jonathan Klein & Roberta Rubin, *Nonprofit Guaranties in Tax Credit Transactions*, 9 J. Affordable Hous. & Cmty. Dev. L. 302, 308–09 (2000) ("During the predevelopment stage of an affordable housing development, a stage that may take one year, two years, or even longer, seed money financing is essential.  Virtually no predevelopment lender will provide unsecured funding to a single-purpose limited partnership for a project that does not have permits, approvals, complete financing, and sometimes even real estate without an unlimited guaranty of repayment.").[4]

Appellant Robert Templeton is a trial attorney who has practiced law in Texas for over fifty years.  Templeton became acquainted with Sterquell in the 1980s.  Starting in the late 1990's, Templeton and his wife began investing in AHF and AHF-related entities through Sterquell—ultimately investing over

---

[2] These costs typically could not be financed through banks.

[3] LPs are pass-through entities for tax purposes.  *See* 26 U.S.C. § 701.

[4] The IRS has issued guidance for limiting guaranties in LIHTC partnerships "to ensure that the nonprofit's obligations to its for-profit partner do not violate its charitable purpose."  Mittereder, *supra*, at 84–85.

No. 14-10563

$5 million.  Most relevant here, from 2006 to 2008, Templeton invested in various LPs in the manner described above—i.e., either AHF or a wholly-owned AHF subsidiary served as the general partner (taking a 1% or less equity interest in the LP), while Templeton served as a limited partner (taking, along with other limited partners, most of the equity in the LP).  Templeton's investments in five of these LPs—GOZ No. 1, Ltd. ("GOZ"); LIHTC-M2M No. 2, LP ("M2M-2"); LIHTC-M2M No. 3, LP ("M2M-3"); LIHTC Walden II Development, Ltd. ("Walden II"); and AHF Gray Ranch, Ltd. ("Gray Ranch")—are at issue in the present appeal.[5]

These LPs, in which Templeton invested over $2 million,[6] were formed for the purposes of developing various residential properties.  Because these investments do not appear to have been well-documented, the details surrounding the investments are less than clear.  For instance, according to Templeton, some of his later investments consisted of the "rolled over" value of his earlier investments.  In any event, concurrent with each investment, AHF purported to guaranty repayment of the investment—sometimes with interest.  The guaranty documents, however, are in key respects flawed.  For example, some of the documents state that AHF "agree[d] to pay, when due or declared due as provided in the Loan Documents, the Guaranteed Investment to [Templeton]"—even though there do not appear to be any associated "Loan Documents."  With respect to another LP, AHF guaranteed the return of Templeton's "Initial Capital Contribution"—defined as the amount of cash

---

[5] During this time period, Templeton also invested in WI-HURIKE, Ltd. ("Hurike"). However, Templeton, dropped his claims based on his Hurike investment after the bankruptcy court disallowed the Hurike-based claim of another creditor.  As such, those claims are not at issue in this appeal.

[6] In 2007, Templeton earned over $8 million through the sale of certain oil and gas interests.

Templeton invested "prior to the Effective Date"—even though Templeton made all of his investments *after* that Effective Date.[7]

Templeton testified that he invested in the LPs to make money, not to gain tax benefits: "The reason I got into [these investments] is this simple. This was the safest kind of investment that I had seen with those guarantees, with the financial condition of this company and the history that I had, and the return." However, the record is clear that Templeton sought significant tax benefits as a result of most of his investments. In addition, Templeton received quarterly interest payments in relation to his investments in Walden II.

It is undisputed that many of the funds Templeton and others invested in the LPs were not put to their intended purposes. Rather, Sterquell used his LIHTC investment arrangements to obtain funds and fraudulently divert them from the LPs, using the funds to benefit himself, AHF, and other associated entities for purposes other than the purported aims of the LPs. In particular, the bankruptcy court found that AHF and Sterquell used AHF Development, Ltd. ("AHFD")—an LP for which AHF served as general partner—as a conduit bank account for these activities. The Trustee's First Amended Disclosure Statement ("Disclosure Statement") describes the events leading to AHF's bankruptcy:

> Prior to the [bankruptcy], [AHF] pursued an aggressive strategy of heavily leveraged acquisitions of properties across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low-income housing tax-credit properties. During this time, [AHF] was focused almost exclusively on deals. There was no focus on managing the properties acquired. Over the course of time, because of tightening financial markets and the

---

[7] However, for the reasons discussed below, we need not decide the validity of these guaranties.

inability to obtain tax credit allocations, it became more and more difficult for [AHF] to obtain sufficient cash from lenders or investors to fund all of the various obligations of [AHF]. As a result, [AHF] took cash from properties and used that cash to pay obligations of [AHF] and its related entities. This cash drain from the properties resulted in a deterioration in the condition of the properties because no funds were then available for basic upkeep.

Sterquell committed suicide on April 1, 2009, prompting investigation into his activities and, ultimately, AHF's bankruptcy. Initially, Templeton led a group of creditors and investors that attempted to obtain information regarding the activities of Sterquell and AHF prior to his death. According to the Disclosure Statement, the creditors and investors concluded that "Sterquell had worked with a complex web of interrelated entities that apparently received funds from [AHF] and investors" and "funds invested were not always put in the accounts of the entities in which the funds were invested." The group also discovered that just prior to his death, Sterquell had transferred approximately $24 million in life insurance funds from AHF to trusts controlled by or for the benefit of the Sterquell family.[8]

**B. Procedural Background**

On April 21, 2009, creditors of AHF filed an involuntary petition against it pursuant to Chapter 11 of the Bankruptcy Code. On June 11, 2009, AHF filed a voluntary petition pursuant to Chapter 11. The bankruptcy court consolidated the two cases and appointed Walter O'Cheskey as the Chapter 11 Trustee. On December 7, 2010, the bankruptcy court approved the Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors (the "Plan").

---

[8] Ultimately, Templeton, as the initial Chairman of the Creditors Committee in the AHF Bankruptcy, brought an adversary action and successfully litigated for the return of those life insurance proceeds to the bankruptcy estate.

No. 14-10563

## 1. The Plan and Disclosure Statement

The Plan elucidates the scope of this bankruptcy—involving claims totaling more than $100 million.  Under the Plan, creditors' claims are prioritized into 19 classes.  Most relevant here are the last three classes—Class 17, Class 18, and Class 19.  Class 17 applies to "Allowed General Unsecured Claims."  Under the Plan, claims in that class (estimated at between $70.6 and $87.2 million) are entitled to receive a pro rata share of distributions from the trust assets after liquidation and after payment in full of claims in Classes 1 through 14.  The Plan further estimates the recovery for claims in this class at between 20% and 40%.  Templeton contends that his claims should fall within this class.

The Trustee contends, however, that to the extent Templeton's claims are valid, those claims should fall within Class 18—"Allowed Subordinated Claims."  The Plan estimates that approximately $8 million in claims fall within this class—for which the estimated recovery is 0%.[9]  The Disclosure Statement sheds light on the Trustee's original reason for seeking subordination of certain claims (such as Templeton's) into Class 18:

> The Chapter 11 Trustee believes that, while AHF and its tax-credit limited partners were engaged in the legitimate affordable housing business, Sterquell and some, but not all, "soft-money" investors were involved in the illegitimate activity of manufacturing illegitimate tax basis and therefore taking illegitimate tax deductions in return for what were in actuality loans.
>
> . . .
>
> The soft-money structure was sometimes designed by Sterquell and participated in by certain "soft-money" investors, who knew or should have known that the investment was purely

---

[9] According to the Plan, claims in Class 18 will not be paid out until payment in full of the claims in Classes 1 through 17.

7

for illegitimate and improper tax purposes. The Chapter 11 Trustee believes that the real purpose was to disguise true loans as equity investments to take tax deductions through falsely manufactured tax basis in amounts several times the actual investment. These soft-money claims relate to money invested in Affiliates listed on Exhibit F attached hereto. The Chapter 11 Trustee intends to object to and request subordination of soft-money-investor claims arising from or related [to] an abusive tax shelter.

To be clear, some soft-money-investor claims may not arise from or relate to an abusive tax shelter and may be legitimate, allowable claims. But some, not all, soft-money-investor claims appear to arise from or relate to an abusive tax shelter and may, therefore, be objected to and/or subject to a request to subordinate such claims to other unsecured claims.

The final class, Class 19, applies to "Allowed Interests in the Debtor." The Plan states that because AHF is a tax-exempt 501(c)(3) entity, "there are no Allowed Interests in [AHF]." Alternatively, the Plan states that "if such Interests exist, holders of such Interests shall receive no Distributions or retain any property under this Plan on account of such Interests."

### 2.    Templeton's Claim and the Trustee's Complaint

On October 5, 2009, Templeton filed in the bankruptcy proceeding a Proof of Claim, which he most recently amended on October 7, 2011 (the "Claim"). In his Claim, Templeton asserted a "Liquidated Unsecured Claim," in which he sought reimbursement and attorney's fees relating to his investments in GOZ, M2M-2, M2M-3, Walden II, and Gray Ranch. Templeton also brought an "Unliquidated Unsecured Claim," asserting fraud, breach of fiduciary duties, and money-had-and-received claims in relation to those investments. Finally, Templeton asserted "a claim of constructive trust and

equitable lien on all funds and assets of [AHF] that are traceable from Templeton's funds and respective Partnership funds received by [AHF]."[10]

On August 31, 2010, the Trustee commenced the present adversary proceeding by filing a complaint objecting to Templeton's Claim on various grounds. The Trustee filed an amended complaint on April 4, 2011, contending that the guarantees are not valid contractual obligations and, alternatively, that the entirety of Templeton's Claim should be subordinated to the claims of all general unsecured creditors. The Trustee also alleges causes of action for the avoidance and recovery of various allegedly fraudulent and preferential transfers.

### 3.     Bankruptcy Court Decision

Over the course of 11 months, the bankruptcy court held a 25-day trial in this matter, issuing Findings of Fact and Conclusions of Law on March 30, 2013. In its conclusions of law, the bankruptcy court began by noting that "[t]he Templeton Deals frustrate legal analysis." The court summarized the deals as follows:

> In each deal, Templeton was a major investor. For the same investment dollars, Templeton received a guaranty from AHF, which, according to Templeton, was a guaranty of repayment of the amount of the investment. Templeton contends that the guaranties are, in effect, unconditional promises to repay by AHF the amount of the investments. But a guaranty is part of a three-party transaction and is a promise to answer for the repayment of a debt. How does a guaranty bootstrap the Templeton investments into something more? Templeton's construction makes the guaranties promissory notes. By the very structure of each of the Templeton Deals, AHF received nothing in return for its guaranty. In each instance, AHF is, per the deal, nothing more than a fractional interest holder in the limited partnership into which

---

[10] Templeton also brought various "Alternative Derivative Claims" on behalf of the LPs in which he invested. These claims are not at issue in this appeal.

Templeton's investment dollars were to flow.  The structure defies an interpretation that AHF received any consideration for its absolute, unconditional promise to repay Templeton's investment.

The court also determined that the guaranties "do not actually provide that AHF guaranteed the amount of Templeton's investments."  Moreover, the court determined that there was no evidence that the interests Templeton had purportedly "rolled over" as part of his investment in Walden II had any real value.

The bankruptcy court next determined that, in order to address Templeton's Claim and the Trustee's causes of action, it needed to characterize Templeton's deals.  The court "look[ed] behind the form of the Templeton Deals and construe[d] each deal as an integrated whole."  The court deemed the deals "wildly beneficial to Templeton" and "too good to be true," and determined that "[t]he 'product' Templeton acquired as a result of his investment was not based on economic reality."  The court further found that Templeton was "at best, . . . willfully blind to the risks" of his investments and "was clearly complicit with Sterquell at the threshold of each of these deals."  Noting that the bankruptcy courts have the power to recharacterize debt as equity, the court looked to Texas law to "determine whether the Templeton Deals are investments that create . . . an equity claim or debt subject to treatment as an unsecured claim."  Applying various factors drawn from the caselaw, the court concluded "that Templeton's 'investments' were indeed equity investments and must be treated as such."

The court then proceeded to address mandatory subordination under Section 510(b).  Noting that the term "security" is defined broadly under the Bankruptcy Code, the court determined that Templeton's investments—which the court had already deemed equity investments—constitute "securities" under the Code.  Therefore, the court concluded that Templeton's unliquidated

claims (based on fraud and related theories) fell within the requirements of Section 510(b). The court rejected Templeton's argument that he did not own any interest in AHF (only in the LPs), noting that Section 510(b) also applies to affiliates of the debtor. The court determined that the various LPs constitute affiliates of AHF, given that AHF fully controlled even the LPs for which it did not serve as a general partner.

The court next denied the Trustee's fraudulent transfer claim, concluding that Templeton "gave value and did so in good faith for his investments." The court rejected the argument that Templeton's participation in an illegitimate tax scheme defeated an assertion of good faith, given that "any complicity by Templeton with Sterquell concerning illegitimate tax deals did not defraud other creditors of AHF." The court did, however, void various preferential transfers made to Templeton within 90 days of AHF's filing of bankruptcy, reasoning that the funds came from an account of AHFD which was "wholly controlled by AHF and, therefore, constitute[d] payments from AHF."[11]

In its judgment, the bankruptcy court ordered that:

- "Templeton's Claim is subordinated to all allowed general unsecured claims pursuant to the provisions of 11 U.S.C. § 510(b);"
- "The Trustee's cause of action for the equitable subordination of Templeton's Claim pursuant to 11 U.S.C. § 510(c) is denied;"
- "The Trustee's cause of action for the avoidance and recovery of fraudulent transfers to Templeton under 11 U.S.C. § 548 is denied;" and

---

[11] In its findings of fact, the court found that AHFD was "an entity controlled by AHF and Sterquell and used by AHF and Sterquell as a conduit bank account."

11

- "The Trustee's cause of action for the avoidance and recovery of preferential transfers in the amount of $157,500 to Templeton is granted under 11 U.S.C. § 547(b)."

### 4.    District Court Decision

On appeal, the district court affirmed the bankruptcy court's judgment in full.  The court first adopted the bankruptcy court's findings of fact, concluding that the findings were supported by evidence and not clearly erroneous.  The district court also determined that the bankruptcy court did not err in recharacterizing and subordinating Templeton's claims, given that (1) the LPs were affiliates of AHF; and (2) the bankruptcy court "properly relied upon the evidence and substance of the transactions in finding that the claims arose from the purchase of equity."  With respect to the affiliate issue, the district court noted that "Templeton did not object to or appeal the order confirming the plan, which incorporated as affiliates all the [LPs] at issue." The court further held that the bankruptcy court did not err in granting the Trustee's claim for preferential transfers, as it found no error in the bankruptcy court's findings that AHFD "was nothing more than a pass-through conduit bank account."  The district court also rejected the argument that the payments from AHFD to Templeton were made in the ordinary course of business, as the payments were made in furtherance of fraud.  With respect to the purportedly fraudulent transfers, the district court affirmed the bankruptcy court's finding of good faith, as the evidence supported the bankruptcy court's findings that (1) Templeton gave value to AHF, and (2) Templeton gave such value in good faith.

## II.    Standard of Review

This court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo.  *Morton v. Yonkers* (*In re Vallecito Gas,*

*L.L.C.)*, 771 F.3d 929, 932 (5th Cir. 2014). "Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 480 (5th Cir. 2009) (internal quotation marks omitted).

## III.   Discussion

### A.     Mandatory Subordination under Section 510(b)

The Trustee and Templeton primarily dispute the appropriate prioritization of Templeton's claims relative to those of other claimants. As discussed above, the Plan prioritizes claims against AHF into 19 classes. Templeton argues that his claims should fall within Class 17 as "General Unsecured Claims"—for which the estimated recovery would be 20% to 40% of the value of his claims. The Trustee argues that Templeton's claims should fall within Class 18—"Allowed Subordinated Claims"—a class for which the estimated recovery is 0%. The bankruptcy court held in favor of the Trustee, ordering that Templeton's entire Claim be "subordinated to all allowed general unsecured claims."

As an initial matter, we note that the bankruptcy court's reasoning, at least with respect to Templeton's claims arising out of AHF's guaranties, appears to be premised on a recharacterization of those guaranties as equity interests in AHF pursuant to 11 U.S.C. § 502(b). *See Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 543 (5th Cir. 2011) (holding that recharacterization stems from bankruptcy court's power to disallow a claim, but that "recharacterization is appropriate when the claimant has *some* rights [vis-à-vis] the bankrupt" (internal quotation marks omitted)). Accordingly, much of the parties' briefing is focused on this recharacterization issue.

13

Nonetheless, we need not reach that issue,[12] as we conclude for the reasons discussed below that Section 510(b) mandates the subordination of Templeton's entire Claim. Indeed, the bankruptcy court's judgment does not mention recharacterization under Section 502(b), but rather states that "Templeton's Claim is subordinated pursuant to the provisions of 11 U.S.C. § 510(b)." It is fundamental that we "review[] judgments, not opinions," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), and that "this court may affirm a judgment upon any basis supported by the record," *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998).

It is also worth noting that throughout this action, the primary theory underlying the Trustee's objection to Templeton's Claim has stemmed from the premise that Templeton's investments were abusive tax shelters and that Templeton "knew or should have known that the investment[s] [were] purely for illegitimate and improper tax purposes." Even assuming *arguendo* the truth of this premise, we need not decide whether such misconduct warrants subordination under the Bankruptcy Code. Rather, as discussed below, we affirm the judgment subordinating Templeton's Claim solely on the basis of Section 510(b), which is narrowly focused on the nature of the claims and transactions at issue.

Section 510(b) states:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be

---

[12] A threshold issue in the bankruptcy court's recharacterization analysis is whether Templeton's equity investments in the LPs can be "recharacterized" as equity investments in AHF. Most of the recharacterization case law involves recharacterizing transactions in the same entity. The bankruptcy court's *judgment*, relying as it does on Section 510(b), avoids this issue, as do we.

subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). This provision "'serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets.'" *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 417 (5th Cir. 2009) (quoting *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067, 1071 (9th Cir. 2007)). "[T]he most important policy rationale" behind Section 510(b) is that claims "seek[ing] to recover a portion of claimants' equity investment[s]" should be subordinated. *Id.* at 421. Moreover, "Section 510(b) applies whether the securities were issued by the debtor *or by an affiliate of the debtor*." Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 510.04[04] (16th ed. 2014) (emphasis added). Accordingly, this provision makes clear that claims arising from equity investments in a debtor's affiliate should be treated the same as equity investments in the debtor itself—i.e., both are subordinated to the claims of general creditors. The Trustee argues, and we agree, that all of Templeton's claims are claims "for damages arising from the purchase or sale of" a "security . . . of an affiliate of [AHF]." We reach this result through a step-by-step analysis of this provision.

We first conclude that Templeton's claims are claims for "damages." With respect to the "unliquidated claims"—i.e., those for fraud, breach of fiduciary duties, and money-had-and-received—Templeton clearly seeks damages for injuries resulting from these torts.[13] *Cf. Baroda Hill Invs., Ltd.*

---

[13] Indeed, Templeton asserted in his Claim that he was "damaged as a result of the fraud." Moreover, Templeton does not appear to dispute that the unliquidated claims are

No. 14-10563

*v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2002) ("Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."). Whether Templeton's "liquidated claims" (seeking reimbursement under AHF's guaranties) also constitute claims for damages is a more difficult question. Several bankruptcy courts have reasoned that "the concept of 'damages'" under Section 510(b) "has the connotation of some recovery *other than* the simple recovery of an unpaid debt due upon an instrument." *In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988) (holding that claim for recovery on debtor's promissory note should not be subordinated under 510(b)); *see also In re Wyeth Co.*, 134 B.R. 920, 921–22 (Bankr. W.D. Mo. 1991) (reasoning that "the use of the term 'damages' implies more than a simple debt" and holding that debt on promissory notes should not be subordinated). Yet the situation is different where, as here, the unpaid debt is itself an equity investment. Templeton is not merely seeking recovery under independent promissory notes, but rather under guaranties which the bankruptcy court found to be "intimately intertwined" with the LP agreements.[14] Although Templeton is suing for the breach of the guaranties of his LP interests (rather than suing directly for repayment of his equity investments in the LPs), this is exactly the elevation of form over substance that Section 510(b) seeks to avoid—by subordinating

claims for damages, but rather argues only that those claims do not arise out of the purchase of security interests.

[14] The court found that "[a]nalyzing one instrument is pointless without consideration of the others." Templeton has given us no reason to conclude that these findings are clearly erroneous. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir. 1991) ("[Bankruptcy courts] possess the power to delve behind the form of transactions and relationships to determine the substance.").

16

claims that functionally seek to "recover a portion of claimants' equity investment[s]."[15] *In re SeaQuest Diving, LP*, 579 F.3d at 421. Moreover, as this court has noted, various circuits "have adopted [a] broad reading of the damages category" contained in Section 510(b), and "the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct"—i.e., conduct after the issuance of the security—"such as breach of contract."[16] *Id.* (citing *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 831–32 (9th Cir. 2001), *In re Telegroup, Inc.*, 281 F.3d at 141–42, *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180–81 (10th Cir. 2002), and *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d Cir. 2006)). Templeton's guaranty claims here are essentially breach of contract claims, as Templeton himself concedes in his opening brief on appeal: "A breach of a guaranty is a breach of contract . . . ." Accordingly, all of Templeton's claims are fairly characterized as claims for "damages."

Next, there is no doubt that the LP interests Templeton purchased constitute "securities" within the meaning of Section 510(b). The Bankruptcy Code expressly defines the term "security" to "include[] . . . [an] interest of a limited partner in a limited partnership." 11 U.S.C. § 101(49)(A)(xiii).[17]

---

[15] As discussed above, we need not decide whether the guaranties themselves constitute debt rather than equity interests. In any event, "the circuit courts agree that a claimant need not be an actual shareholder for his claim to be covered by § 510(b)." *In re SeaQuest*, 579 F.3d at 422 (internal quotation marks and brackets omitted).

[16] These statements were dicta, as the court was addressing the rescission category, rather than the damages category, of Section 510(b). *See In re SeaQuest*, 579 F.3d at 422. In any event, we find the court's discussion persuasive.

[17] Templeton argues that the unliquidated claims are not securities, but that contention is inapposite. Although the claims themselves may not constitute securities within the meaning of the Bankruptcy Code, those claims nonetheless arise from the sale of securities of affiliates of AHF, and thus fall within the ambit of Section 510(b), for the reasons discussed below.

We also conclude that Templeton's claims arise from the purchase of those securities. "For a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *In re SeaQuest Diving, LP*, 579 F.3d at 421. We have little difficulty finding such a nexus between Templeton's claims and his purchase of the LP interests. In his opening brief on appeal, Templeton makes clear that his unliquidated tort claims stem directly from the LP investments; he asserts that: (1) AHF breached its fiduciary duties by allowing the funds he invested in the LPs "to be commingled and misappropriated;" (2) AHF defrauded Templeton by making "false statements to Templeton about his investments in the [LPs];" and (3) "monies provided by Templeton for the [LPs] were taken and used by AHF in a manner outside the scope and intent of the [LP] transaction documents." With respect to the guaranty claims, as discussed above, the bankruptcy court specifically found that the guaranties were "intimately intertwined" with the LP agreements, and that "the guaranties cannot be considered apart from the other transactions that arose in connection with the investments." These findings are not clearly erroneous; rather, it is clear from the record that the guaranties, at least in part, induced Templeton to make these investments. Thus, we conclude that there is at least "some nexus or causal relationship" between Templeton's claims and his purchase of the LP interests. *Id.* And as discussed above, the fact that Templeton is effectively attempting to recoup his equity investments in the LPs through his claims supports the application of Section 510(b) here. *Id.* ("For a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale." (internal citation omitted)).

Furthermore, the LP interests here are securities "of an affiliate of [AHF]." 11 U.S.C. § 510(b). The Bankruptcy Code defines "affiliate," in relevant part, as a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor."[18]   11 U.S.C. § 101(2)(C). We first note that the Plan, confirmed by the bankruptcy court, states that all of the LPs at issue here are affiliates of AHF "pursuant to section 101(2) of the Bankruptcy Code." In any event, setting aside the Plan provision, we conclude that the LPs are affiliates of AHF.

First, all of the LPs—GOZ, M2M-2, M2M-3, Walden II, and Gray Ranch—are "persons" under the Bankruptcy Code. 11 U.S.C. § 101(41) (defining the term "person" to "include[] . . . partnership[s]"). Second, each of the LPs is "operated under a[n] . . . operating agreement," 11 U.S.C. § 101(2)(C)—i.e., the LP agreements. Although the term "operating agreement" is undefined in the Bankruptcy Code, there is little doubt that the LP agreements qualify. They are quite literally agreements under which the LPs operate; the agreements define the business and purposes of each LP, making clear that each LP acts through its general partner to accomplish those purposes.[19] We also conclude that the LPs were "operated under . . . operating

---

[18] The Bankruptcy Code includes three other definitions of "affiliate," none of which are applicable here.

[19] We are not alone in reaching such a conclusion, s*ee In re Minton Grp., Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983) (concluding that LP is affiliate of general partner debtor who "operates all of the business and manages all of the property of the limited partnership under a limited partnership agreement"), *aff'd*, 46 B.R. 222 (S.D.N.Y. 1985); *cf. Jenkins v. Tomlinson (In re Basin Res. Corp.)*, 190 B.R. 824, 826–27 (Bankr. N.D. Tex. 1996) (concluding that joint venture agreements constitute operating agreements), and we are aware of no court that has held that LP agreements do not constitute "operating agreements" under the Bankruptcy Code, *cf. In re Wash. Mut., Inc.*, 462 B.R. 137, 145–46 (Bankr. D. Del. 2011) ("Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute."). Templeton relies on *In re SemCrude, L.P.*, 436 B.R. 317 (Bankr. D. Del. 2010), in arguing that LP agreements are not

agreement[s] *by a debtor*." 11 U.S.C. § 101(2)(C) (emphasis added). We first note that the statute is unclear as to whether the "by a debtor" phrase is meant to modify the word "operated" or the phrase "operating agreement." Applying the former construction, it is clear that all of the LPs were "operated . . . by" AHF, as Templeton himself concedes: "AHF, as general partner of the [LPs] (or otherwise in control of the general partner of the [LPs]) had legitimate control of those entities giving AHF control over whatever revenue or income came to those entities." Under the latter construction, for which Templeton advocates, the operating agreement itself must be "by a debtor"—which may imply that the debtor must be a party to that agreement. But even under that construction, we conclude that the LP agreements are agreements "by" AHF. We easily reach this conclusion with respect to the LPs for which AHF served as a general partner—i.e., GOZ and Walden II—as AHF was a party to those LP agreements. But even for the LPs in which a wholly-owned subsidiary of AHF served as a general partner—M2M-2, M2M-3, and Gray Ranch—we conclude that those LP agreements were agreements "by" AHF within the meaning of the Bankruptcy Code. Even though AHF was not a direct party to those agreements, it is undisputed that AHF, through Sterquell, had complete control over these LPs. The bankruptcy court made the following factual findings with respect to this issue:

> Even where an AHF subsidiary was the named general partner in a partnership agreement with Templeton, AHF (and, really, Sterquell) was the party in full control. Any intermediary did not affect AHF's (or Sterquell's) control. . . . As Templeton himself has stated, Sterquell, and by association, AHF, exerted total control over all aspects of the Templeton Deals. This control was

---

operating agreements, but in that case, the court determined that an LP was not an affiliate under the Bankruptcy Code because "[n]o . . . operating agreement was introduced into evidence" and the existence of an LP was only "mentioned" in hearings and briefs. *Id.* at 321. Here, all of the LP agreements are contained in the record.

No. 14-10563

formalized by the partnership agreements and the formalized relationship between the partnerships and AHF or a wholly owned conduit.

Templeton gives us no reason to question these factual findings. It is therefore clear that, as a factual matter, AHF was the operator of these LPs despite the fact that it was not a formal party to the LP agreements. Accordingly, we hold that these agreements were operating agreements "by" AHF, as the wholly-owned subsidiaries were only shell entities and, in the words of the Bankruptcy Court, "conduit[s]" through which AHF acted.

We recognize that this conclusion is in tension with decisions reached by several bankruptcy courts. *See In re Wash. Mut., Inc.*, 462 B.R. at 146 (holding that "because the agreement in question is between two non-debtors, it cannot provide a basis for subordination under section 101(2)(C)," and rejecting the argument that "mere 'control' of an entity is sufficient to ignore its legal separateness"); *In re SemCrude, L.P.*, 436 B.R. at 321 ("[E]ven if the Debtors could show that the partnership agreement is a lease or operating agreement, the agreement is between two non-debtors."); *In re Sporting Club at Ill. Ctr.*, 132 B.R. 792, 797 (Bankr. N.D. Ga. 1991) (determining that entity was not an affiliate of debtor for purposes of venue statute where the debtors were not "parties to any lease or operating agreement"); *In re Maruki USA Co.*, 97 B.R. 166, 169 (Bankr. S.D.N.Y. 1988) (rejecting, for purposes of venue statute, argument that entity was affiliate of debtor where debtor owned 100% of stock of entity's general partner). These cases—to which we are not bound—have applied unduly strict interpretations of the phrase "agreement by a debtor," 11 U.S.C. § 101(2)(C), ignoring that an agreement may functionally be "by" the debtor even where the debtor is not a party to the agreement. We see no reason why the existence of a shell conduit between a debtor and an entity—which in no way inhibits the debtor's ability to control and operate that entity—should

21

preclude a finding of affiliate status. The *In re Washington Mutual* court relied in part on the theory underlying Section 510(b), reasoning that the claimant "should be treated like any other creditor of [the debtor] because [the claimant] never assumed the risks of a . . . shareholder" of the debtor, but rather assumed only the risks of a shareholder of a separate entity. *In re Wash. Mut., Inc.*, 462 B.R. at 147. But this line of reasoning would seem to preclude mandatory subordination of *any* claim arising from the purchase of an affiliate's securities (since the securities of the affiliate are not shares in the debtor)—a result at odds with the plain language of Section 510(b). Rather, Congress clearly intended that claims arising from the purchase of securities of entities over which the debtor exercised sufficient control—i.e., entities which qualify as affiliates under the Bankruptcy Code—be treated no differently than claims arising from the purchase of securities of the debtor itself. *See* Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 510.04[04] (16th ed. 2014) ("Section 510(b) applies whether the securities were issued by the debtor or by an affiliate of the debtor.").

Because each of Templeton's claims is a claim for damages arising from the purchase of securities of AHF's affiliates, we hold that Section 510(b) mandates the subordination of those claims. Accordingly, we affirm the bankruptcy court's judgment with respect to subordination.[20]

---

[20] Templeton also argues that AHF is liable to Templeton as the general partner of GOZ and Walden II, correctly noting that, "in a limited partnership, the general partner is always liable for the debts and obligations of the partnership." *Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468, 474 (Tex. App.—Dallas 2008, no pet.). However, Templeton fails to identify what debts or obligations—independent of the liquidated or unliquidated claims— these LPs directly owed Templeton. Assuming Templeton is referring to the Walden II LP agreement's promise to repay Templeton's initial capital contribution (the GOZ LP agreement contains no such promise), and assuming the validity of that promise (which the Trustee challenges), we nonetheless conclude that any claim arising from such a promise must be subordinated under Section 510(b) for the same reasons as compel subordination of the guaranty-based, liquidated claims. The fact that the promise is contained in the LP

No. 14-10563

## B.    Trustee's Objections to Templeton's Claim

The bankruptcy court declined to rule on the Trustee's various objections to the validity of Templeton's Claim in light of its decision to subordinate the Claim.    The Trustee, perhaps recognizing that the practical effect of subordinating Templeton's claim to Class 18 is that Templeton will receive nothing, cross-appeals as to these issues only "[t]o the extent this Court reverses the bankruptcy court's order subordinating the Claim."    Accordingly, because we affirm with respect to subordination, we need not reach the Trustee's objections.

## C.    Preferential Transfers under Section 547

Templeton also challenges the bankruptcy court's decision to grant the Trustee's cause of action for the avoidance and recovery of preferential transfers pursuant to Section 547(b) of the Bankruptcy Code.    This provision generally allows trustees to "avoid any transfer of an interest of the debtor in property" made to creditors "on or within 90 days before the date of the filing of the petition."    11 U.S.C. § 547(b).    The transfers at issue here amount to $157,500 Templeton and his wife received from the AHFD account in the ninety days leading up to AHF's bankruptcy.[21]    Templeton contends that avoidance of these transfers was improper because: (1) the funds in the AHFD account were not funds of AHF, and (2) the payments fall within the ordinary course of business exception to the avoidance of preferential transfers.

### 1.    Property of Debtor

Templeton first argues that the transferred funds were not "interest[s] of the debtor in property," 11 U.S.C. § 547(b), as those funds were held in and

---

agreement itself, and not in a separate guaranty, only solidifies the conclusion that this claim "aris[es] from the purchase . . . of . . . a security" of Walden II.  11 U.S.C. § 510(b).

[21] Templeton asserts that these payments were "quarterly preferred return payments provided for in Templeton's transaction with Walden II."

23

transferred from the AHFD account—of which AHF was not a legal titleholder, *see Southmark Corp. v. Grosz (In re Southmark Corp.*), 49 F.3d 1111, 1115 (5th Cir. 1995) ("A preliminary requisite [under Section 547(b)] is that the transfer involve property of the debtor's estate."). Whether these funds constituted property of AHF is a question of state law. *See Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 261–62 (5th Cir. 2012) (applying Texas law to determine whether, under Section 544(b) of the Bankruptcy Code, bank accounts constituted "an interest of the debtor in property"); *see also Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

Although AHF was not the legal titleholder to the AHFD account, "Texas law counsels that the legal titleholder to a bank account is not always the owner of its contents." *In re IFS Fin. Corp.*, 669 F.3d at 262. Rather, an entity can be a "de facto" owner of a bank account if it has a sufficient level of control over the account. *See id.*; *see also In re Southmark Corp.*, 49 F.3d at 1116 n.17 ("[I]t is undisputed that Southmark controlled the funds in the Payroll Account and that it could have paid them to anyone, including its own creditors. For the purposes of preference law, therefore, the money in Southmark's Payroll Account is treated as part of Southmark's estate, *whether or not Southmark actually owns it*."). Thus, in *In re IFS Financial Corp.*, this court held that a debtor had a property interest in bank accounts to which it was not a legal titleholder where the "record reflect[ed] that [the debtor] exercised such control over these accounts that it had de facto ownership over these accounts, as well as the funds they contained." 669 F.3d at 264 ("[T]he facts support the district court's and bankruptcy court's findings that [the debtor] dominated these subsidiaries to such an extent that the subsidiaries acted at [the debtor]'s

24

direction and that the directors and stockholders utilized the corporate entity as a sham to perpetuate a fraud."). The court reasoned that "control is decisive, and that legal title is irrelevant where, as here, a debtor organization has taken care to mask its activities through fictional divisions." *Id.* at 263.

The present case is materially indistinguishable. The bankruptcy court found that AHFD "was an entity controlled by AHF and Sterquell and used by AHF and Sterquell as a conduit bank account," and that "payments made to Templeton out of the [AHFD] account within ninety days of the filing of the Bankruptcy Case were with funds from an account wholly controlled by AHF and, therefore, constitute payments from AHF." These findings—with which Templeton apparently agreed in prior proceedings[22]—are not clearly erroneous. Templeton argues that Sterquell, rather than AHF, controlled the account. But Templeton concedes that Sterquell made various transfers from the AHFD account on AHF's behalf—e.g., to pay AHF's "ordinary needs and expenditures." Accordingly, we find no clear error in the bankruptcy court's conclusions regarding AHF's control (and, consequently, its de facto ownership) of the AHFD account, at least with respect to the funds at issue.[23]

Templeton also asserts a constructive trust theory on appeal, arguing that because the AHFD account "was the res of a constructive trust, . . . AHF never gained title to those funds." However, Templeton has waived this argument by failing to sufficiently raise it before the bankruptcy court.

---

[22] We need not decide, however, whether Templeton's arguments as to this issue are precluded on the basis of issue preclusion or judicial estoppel.

[23] Templeton also argues that a "control theory" should not apply here, given that AHF served as a general partner in AHFD and a general partner always exercises dominion and control over an LP's property. However, the bankruptcy court did not merely find that AHF controlled the AHFD account funds vis-à-vis its role as general partner. Rather, the bankruptcy court determined that the AHFD account was a "conduit" wholly controlled by AHF—and, as Templeton admits, used by AHF for its own purposes.

No. 14-10563

Templeton correctly notes that he alleged a constructive trust theory in his Claim, but, as the bankruptcy court noted, a constructive trust theory "w[as] not raised at trial." It does not appear that Templeton mentioned, much less adequately briefed, a constructive trust theory in either his pre- or post-trial briefing—thus depriving the bankruptcy court an adequate opportunity to rule on the issue. "If an argument is not raised to such a degree that the [trial] court has an opportunity to rule on it, we will not address it on appeal." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) (internal quotation marks omitted); *see also Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1128 (5th Cir. 1993) (stating, in the bankruptcy context, that "the argument must be raised to such a degree that the trial court may rule on it" to avoid waiver).

### 2.    Ordinary Course of Business Defense

Templeton next argues that the ordinary course of business defense applies to these transfers.[24] Under that defense, a trustee may not avoid a transfer under Section 547:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> >
> > (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). "[T]he ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City*

---

[24] Although the ordinary course of business defense was raised by Templeton in the joint pretrial order and in his post-trial briefing, the bankruptcy court did not address that defense in its order.

*Seafoods, Inc.)*, 296 F.3d 363, 367 (5th Cir. 2002).  This court has explained that, "[w]ithout this defense, the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit." *Id.*  Thus, "[l]acking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy." *Id.*

Templeton argues that the payments at issue here—interest payments on his Walden II investments—were regularly made for over a year before Section 547(b)'s preference period began, and were therefore made in the ordinary course of business.  The Trustee does not dispute this history of payments, but rather asserts that the transfers could not have been made in the ordinary course of business because they "were made in furtherance of the Ponzi scheme and Sterquell's fraud."[25]  The Trustee relies on a line of cases narrowly holding that "a Ponzi scheme is not a business, and that transfers related to the scheme are not within the 'ordinary course of business.'" *Henderson v. Buchanan*, 985 F.2d 1021, 1025 (9th Cir. 1993); *see Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 (9th Cir. 1988); *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 216–17 (9th Cir. 1987); *see also Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.)*, 48 F.3d 470, 475–76 (10th Cir. 1995) (rejecting rule that would "prohibit[] application of the ordinary course of business defense for *all* transfers made in the course of a Ponzi scheme" and instead adopting the "narrower proposition that transfers to *investors* [in the course of a Ponzi scheme] are not entitled to the ordinary

---

[25] Although we hesitate to be absolute about the contents of a 20,000+ page record, the Ponzi scheme argument does not appear to have been raised in the bankruptcy court.  We address the issue because the district court ruled on this basis and it has been fully briefed in our court.

course of business exception."). The Fifth Circuit has similarly held, in the context of another ordinary course of business exception within the Bankruptcy Code (Section 546(e)),[26] that "'[t]ransfers made in a 'Ponzi' scheme are not made in the ordinary course of business.'" *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir. 1990) (quoting *In re Bullion Reserve of N. Am.*, 985 F.2d at 1219). Notably, these cases all involved true Ponzi schemes—i.e., operations built on the collection of funds from new investments to pay off prior investors. *See Henderson*, 985 F.2d at 1023 ("[T]he whole operation amounted to a Ponzi scheme."); *In re Bullion Reserve of N. Am.*, 836 F.2d at 1219 n.8 ("The record indicates that BRNA was conducting such a [Ponzi] scheme when it used newly acquired funds, from its comingled accounts, to buy bullion for customers who demanded their metal."); *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 819 F.2d at 216 ("Brooks does not dispute that the debtor was operating a Ponzi scheme . . . ."); *In re Hedged-Invs. Assocs., Inc.*, 48 F.3d at 471 ("The essence of the scheme was to attract investors by guaranteeing substantial returns from stock options trading. Mr. Donahue paid 'profits' to earlier investors with the investment capital of later investors, publicly reporting false earnings as 'proof' of his success."); *Wider*, 907 F.2d at 572 ("Cohen satisfied outstanding debts with older clients—including the debt owed Wider on the bounced checks—from the funds he acquired from later clients. In common industry parlance, Cohen operated a 'Ponzi' scheme.").

AHF's business does not constitute a Ponzi scheme for purposes of this exception. The Trustee points to some evidence in the record that there was

---

[26] In *Wider*, we suggested that the analysis of the exception under Section 546(e) should be the same as that under 547(c)(2). *See Wider*, 907 F.2d at 572 n.1 ("[T]his Court fails to see how a Ponzi scheme could be in the ordinary course of business for purposes of the stockholder defense, but not in the ordinary course of business for purposes of the preference provisions.").

"an element of a Ponzi scheme" in the business, but that evidence shows that only a portion of the funds collected by AHF (Templeton estimates 9%) was used to pay Ponzi-like returns to investors. In any event, the record is clear that AHF engaged in substantial legitimate business—owning or controlling approximately 14,000 housing units. Indeed, the Trustee asserted in the Disclosure Statement that "AHF and its tax-credit limited partners were engaged in the legitimate affordable housing business." Although that business appears to have deteriorated over time—leading to Sterquell's and AHF's later misuse of funds—this does not render the business a Ponzi scheme. The theory underlying the Ponzi exception to the ordinary course of business defense is that "Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)." *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 819 F.2d at 217; *see also Henderson*, 985 F.2d at 1025 ("[A] Ponzi scheme is not a business . . . ."); *In re Bullion Reserve of N. Am.*, 836 F.2d at 1219 ("Congress intended the ordinary course of business exception to apply only to transfers by legitimate business enterprises."). Expanding this exception—as no other court, apparently, has done—to cover legitimate businesses in which there were some fraudulent or Ponzi-like transactions is inconsistent with this theory. Accordingly, because the business at issue here is not a true Ponzi scheme, the transfers do not fall within the narrow Ponzi scheme exception to the ordinary course of business defense.

Therefore, we reverse the judgment granting the avoidance and recovery of the $157,500 in purportedly preferential transfers and remand for further proceedings addressing, inter alia, the ordinary course of business defense raised by Templeton. We intimate no view on the outcome.

No. 14-10563

## D.    Fraudulent Transfers under Section 548

The Trustee also seeks the avoidance and recovery of approximately $1 million in purportedly fraudulent transfers made from the AHFD account to Templeton and his wife between May 1, 2005, and February 2, 2009. The fraudulent transfer provision of the Bankruptcy Code states, in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> >
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(1).[27]   Subsection (A) is referred to as the "actual fraud" provision, while subsection (B) is referred to as the "constructive fraud" provision. *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002).

The bankruptcy court did not address whether the transfers were fraudulent, instead concluding that Templeton is entitled to the good faith defense under Section 548(c). That provision states:

---

[27] The Trustee asserts in his reply brief that "[w]hile the bankruptcy [court] only discussed section 548 [in its order], the Trustee asserts claims under section 544 and [the Texas Uniform Fraudulent Transfer Act ("TUFTA")], as well." However, the Trustee—who is cross-appealing as to this issue—failed to raise either Section 544 or TUFTA in his opening brief on appeal. Accordingly, those claims are waived. *See Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014) ("Ordinarily, arguments raised for the first time in a reply brief are waived.").

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).  The bankruptcy court concluded that Templeton "no doubt gave value in the amount of each of his investments," finding that "Templeton's investments well exceed the transfers."  The court also disagreed with the Trustee's assertion that "Templeton's participation in Sterquell's illegitimate tax schemes defeats his good faith claim," given that "any complicity by Templeton with Sterquell concerning illegitimate tax deals did not defraud other creditors of AHF."  The Trustee contends that the bankruptcy court's conclusion as to good faith was in error because: (1) Templeton did not give value to AHF, and (2) Templeton did not do so in good faith.

First, Templeton may be entitled to the good faith defense only "to the extent [he] gave value to [AHF] in exchange for" the transfers at issue.  11 U.S.C. § 548(c).  Under Section 548, "'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A).  A finding of value is reviewed for clear error, as that determination is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts."  *In re Hannover Corp.*, 310 F.3d at 801 (internal quotation marks omitted).  However, "we review *de novo* the methodology employed by the bankruptcy court in assigning values to the property transferred and the consideration received."  *Id.* (internal quotation marks omitted).  Moreover, "for purposes of § 548 the value of an investment . . . is to be determined at the time of purchase."  *Id.* at 802.  Courts

generally construe the term "value" broadly for purposes of the Bankruptcy Code. *See In re Fairchild Aircraft Corp.*, 6 F.3d at 1127 ("Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises, the increase in a credit line, and the increased monetary 'float' resulting from guarantying the loans of another, as constituting value received under § 548." (footnotes omitted)); *see also Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) ("We have interpreted 'value' to include any benefit, . . . whether direct or indirect. . . . [T]he mere opportunity to receive an economic benefit in the future constitutes 'value' under the Bankruptcy Code." (internal citation, quotation marks, and brackets omitted)).

The Trustee argues that Templeton did not give value to the debtor, AHF, in view of the facts that he made investments in the LPs and, "[a]t the time of the transaction[s], Templeton did not believe that he was giving value to AHF."[28]  The Trustee relies heavily on the following statement in the bankruptcy court's order: "By the very structure of each of the Templeton Deals, AHF received nothing in return for its guaranty.  In each instance, AHF is, per the deal, nothing more than a fractional interest holder in the limited partnership into which Templeton's investment dollars were to flow." However, as discussed above, the bankruptcy court also stated that Templeton

---

[28] We note that the Trustee's focus on Templeton's belief at the time of the investments appears misplaced.  Rather, "the recognized test is whether the investment conferred an economic benefit on the debtor; which benefit is appropriately valued as of the time the investment was made." *In re Fairchild Aircraft Corp.*, 6 F.3d at 1127 (footnote omitted). Although the *In re Fairchild Aircraft Corp.* court was interpreting the term "reasonably equivalent value" under Section 548(a)(2), *id.* at 1125–27, this court has suggested that the same analysis applies to the interpretation of value under Section 548(c), *In re Hannover Corp.*, 310 F.3d at 801.

"no doubt gave value in the amount of each of his investments," and "Templeton's investments well exceed the transfers." These factual findings are difficult to reconcile. Moreover, although the bankruptcy court concluded that "AHF . . . was the party in full control" of the LPs, the bankruptcy court made no factual findings regarding when, how, and to what degree Sterquell and AHF diverted Templeton's investments to AHF for its own use.[29] Thus, we are not in a position to determine whether, at the time of each of his investments, Templeton gave value to AHF.[30]

With respect to whether Templeton entered into the transactions at issue in good faith, we agree with the Trustee that the bankruptcy court applied the wrong standard. In finding good faith, the bankruptcy court relied exclusively on its determination that Templeton's actions did not defraud other creditors of AHF. That is not the test for good faith. Although this court has not announced a definitive definition of good faith under Section 548(c) in a published case, *see In re Hannover Corp.*, 310 F.3d at 800–01 (noting that "there is little agreement among courts regarding the appropriate legal standard for this defense" and declining to "propound a broad rule concerning

---

[29] For example, there are no findings regarding what portion of Templeton's investments was used for the LPs' legitimate business, compared to the portion of those funds used by AHF for its own benefit. Nor are there any findings as to when AHF, through Sterquell, took action to divert the funds.

[30] The Trustee argues that we can reverse and render judgment in its favor on this issue based on the present record, relying on another case arising from similar claims in AHF's bankruptcy proceedings, *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516 (5th Cir. 2013) (unpublished). In *Horton*, which involved similar LP investments, we held that "the bankruptcy court's finding that AHF did not receive any value in exchange for its guaranty [of the LP investment] was not clearly erroneous" where "AHF had a 0.01% partnership interest in [the LP] at the time of the exchange." *Id.* at 520. This holding may be in some tension with the broad construction given to "value" under the Bankruptcy Code. *See In re Fairchild Aircraft Corp.*, 6 F.3d at 1127; *In re Fruehauf Trailer Corp.*, 444 F.3d at 212. In any event, given the conflicting factual findings of the bankruptcy court here, we deem it appropriate to remand with respect to this issue.

'good faith'"), we have stated in an unpublished case that we must "look to whether the claimant was on notice of the debtor's insolvency or the fraudulent nature of the transaction." *Horton*, 544 F. App'x at 520. We further stated:

> The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases . . . .
>
> . . . The weight of the authority . . . indicates that a court should focus on the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known . . . of the fraudulent intent underlying the transfer.
>
> Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement.

*Id.* (quoting *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC),* 439 B.R. 284, 310–12 (S.D.N.Y. 2010)). The parties do not dispute that this is the appropriate test for determining good faith under Section 548(c).

The bankruptcy court did not apply this test below. Even assuming the bankruptcy court was correct in determining that Templeton's actions did not defraud creditors, this does not answer the question of whether Templeton was aware (or on inquiry notice) of AHF's insolvency or fraud. Given that this determination may hinge in part on questions of credibility and Templeton's state of mind with respect to various transactions, *see In re Hannover Corp.*, 310 F.3d at 800 ("The most important set of questions [in the good faith inquiry] concerns the transferee's state of mind."), it would be prudent for the bankruptcy court to apply this test in the first instance.

No. 14-10563

We therefore reverse and remand so that the bankruptcy court may address both issues underlying the applicability of the good faith defense—whether Templeton gave value in exchange for the transfers and whether he did so in good faith—in a manner consistent with this opinion.[31]

## IV.    Conclusion

For the foregoing reasons, we AFFIRM the subordination of Templeton's claim and REVERSE the bankruptcy court's rulings on the alleged preferential and fraudulent transfers and REMAND for further proceedings consistent with this opinion.

---

[31] In addition, if the bankruptcy court deems the good faith defense inapplicable, it must determine in the first instance whether the transfers were either actually or constructively fraudulent.